IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 6, 2024

**ANTONIO BENSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-04060    Lee V. Coffee, Judge**

_____

**No. W2023-00668-CCA-R3-PC**

_____

The Petitioner, Antonio Benson, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief challenging his conviction for first degree premeditated murder.  On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his claim alleging that his attorneys were ineffective for failing to meaningfully present the Petitioner's self-defense claim.  After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

Robert L. Sirianni, Jr., (on appeal), Winter Park, Florida, and C. Ann Tipton (at post-conviction hearing), Memphis, Tennessee, for the appellant, Antonio Benson.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

### I.    FACTUAL AND PROCEDURAL HISTORY

#### A.    Trial and Direct Appeal

On May 31, 2013, the Petitioner shot and killed the victim, Amy Hallmon, at the home of Kevin Williams.  *State v. Benson*, 600 S.W.3d 896, 898 (Tenn. 2020), *cert. denied*, 141 S.Ct. 427 (Oct. 5, 2020).  A Shelby County grand jury indicted the Petitioner for the

offense of first degree murder in August of 2013. The Petitioner proceeded to a jury trial represented by two attorneys ("lead counsel" and "co-counsel" or collectively as "trial counsel").

The following pertinent facts and procedural history are derived from our supreme court's opinion in this case on direct appeal. *See id*. at 898-902. At trial, Mr. Williams testified that he, the Petitioner, and the victim were at his residence socializing. During the evening, the Petitioner asked the victim to perform oral sex on him. When the victim refused, the Petitioner grabbed the back of the victim's head. The victim told the Petitioner, "I'm not playing with you," and the Petitioner backed away. Twice more, the Petitioner demanded oral sex from the victim. After the third demand, the victim swung at the Petitioner twice, striking him once and causing his nose to bleed. The victim —a "petite woman"—then began to verbally taunt the Petitioner. The Petitioner pulled a handgun out of his back pocket and asked Mr. Williams, "Hey, Cous, man, you think I should shoot that b----?" Mr. Williams replied, "Hell, no, fool, she told you to quit messing with her." Instead of heeding Mr. Williams's advice, the Petitioner told the victim, "B----, I feel sorry for your kids," before shooting her five times, including twice in the back. Mr. Williams stated that the Petitioner dragged the victim outside and then returned to the house without the victim. The victim's body was found early the next morning with multiple gunshot wounds, as well as abrasions and contusions indicating she had been dragged.

In Petitioner's statement to police, introduced as evidence at trial, the Petitioner claimed he and the victim were arguing because the victim demanded drugs, and the Petitioner would not give her any. The Petitioner admitted that after being hit by the victim in the nose, he shot the victim at least twice. The Petitioner stated that he and the victim, despite her being shot, continued to argue and that they eventually moved "behind" Mr. Williams's home, where the Petitioner shot the victim again as they were on the ground fighting. The Petitioner also admitted that after the shooting he went home and later wrapped the gun in a bag and disposed of it in a garbage can.

The medical examiner testified that the victim's toxicology report showed numerous drugs in the victim's blood. The medical examiner stated that these drugs could cause agitation, aggressiveness, anxiety, paranoia, and hallucinations. However, he could not say how these drugs affected the victim personally.

After the State's proof, the defense moved for judgment of acquittal, which the trial court denied. At that time, the defense requested that a self-defense instruction be given to the jury, stating that the State's proof showed that the victim was the first aggressor. The trial court found that although the victim threw the first punch, this did not necessarily

justify the Petitioner's shooting her. The trial court reasoned that the victim was unarmed, had not threatened or attempted to use unlawful deadly force against the Petitioner, and had not caused or threatened to cause serious bodily injury to the Petitioner. Therefore, the trial court denied the Petitioner's motion to submit a self-defense instruction to the jury, finding that self-defense had not been "fairly raised" by the proof.

The defense called only one witness, Lady Jordan, who testified that she saw the Petitioner trip and fall on the day of the shooting. Ms. Jordan stated that the Petitioner's nose looked different and "messed up"; however, she did not know what caused the difference.

The defense then rested and notified the court that they had now filed a formal written request for a self-defense instruction. The defense argued that their witness's testimony fairly raised the issue of self-defense, in that Ms. Jordan's testimony established that the Petitioner's nose had been disfigured as a result of his being punched by the victim. The trial court again denied the motion, stating that Ms. Jordan testified she did not know when or how the Petitioner had hurt his nose. The trial court again found that the Petitioner did not sustain a serious bodily injury and that even if the problem with his nose had been caused by the victim's punch, it still did not amount to "serious bodily injury" that would allow the deadly force to be used as a defense.

The trial court then gave final instructions to the jury and did not include any charge related to whether the Petitioner acted in self-defense. The jury found the Petitioner guilty of first degree murder, and the trial court sentenced him to life in prison. The Petitioner filed a motion for new trial, arguing, amongst other things, that the trial court erred in its denial to give a self-defense instruction. The trial court denied the Petitioner's motion.

On appeal, this court reversed the Petitioner's conviction based on the trial court's refusal to instruct the jury on self-defense, holding the issue was fairly raised by the proof. *State v. Benson*, No. W2017-01119-CCA-R3-CD, 2018 WL 5810004, at \*8-9 (Tenn. Crim. App. Nov. 5, 2018), *perm. app. granted* (Tenn. Apr. 12, 2019). The State appealed to the supreme court, who reversed this court's decision and reinstated the trial court's judgment, concluding that the trial court properly refused to instruct on self-defense consistent with its role as "gatekeeper." *Benson*, 600 S.W.3d at 908. The supreme court concluded that self-defense was not fairly raised by the proof even "when viewed in the light most favorable to the [Petitioner]." *Id.* at 907. The supreme court reasoned,

> At most, the defense proof fairly raised the issue of whether the [Petitioner] was justified in using *non-lethal* force to protect himself from the victim.

> The [Petitioner] here, however, is not attempting to justify a simple assault against the victim. Instead, he chose to respond to a punch in the nose by pulling out a gun and shooting a small, unarmed woman five times, including twice in the back.

*Id*. Even if self-defense had been fairly raised by the proof, the supreme court added, the trial court's failure to provide the instruction to the jury "would have been 'harmless beyond a reasonable doubt because no reasonable jury would have accepted the [Petitioner's] self-defense theory.'" *Id*. (quoting *State v. Perrier*, 536 S.W.3d 388, 404-05 (Tenn. 2017)).

### B.     Post-Conviction Proceedings

On April 23, 2021, the Petitioner, through counsel, filed a "Petition for Relief from Conviction or Sentence" along with a supporting memorandum,[1] arguing that he was denied constitutionally effective counsel by the attorneys who represented him at trial and on appeal. Specifically, the Petitioner argued that his trial counsel were ineffective for failing to meaningfully present his self-defense claim. According to the Petitioner, trial counsel rendered deficient performance when they failed to present any evidence of a self-defense claim outside the opening remarks to the jury. The Petitioner claimed that "the only other time [t]rial [c]ounsel attempted to introduce a self-defense claim at trial was [the] failed attempt to request a jury instruction from" the trial court. The Petitioner asserted that trial counsel should have presented the Petitioner's self-defense claim "as a motion-in-limine, a motion for directed verdict, or any other suitable method[.]" Relative to prejudice, the Petitioner states that this court's opinion on direct appeal confirmed that his "self-defense claim had substantial merit," which is indicative of the prejudicial nature of trial counsels' deficiency. A post-conviction hearing was held on February 10, 2023, at which lead counsel and the Petitioner testified.

Lead counsel testified that he started practicing law in 2011 and had handled several first degree murder cases prior to Petitioner's trial. He was appointed to represent the Petitioner six months before the case went to trial and was assisted by co-counsel, whom

---

[1] The supporting memorandum was styled by counsel as a "Memorandum of Law in Support of Petitioner's Request for a Writ of Habeas Corpus." The parties and the post-conviction court treated the petition as a petition for post-conviction relief, and we will do the same. *See* Tenn. Code Ann. § 40-30-105(c). We note that the original pleadings in this case were filed on the Petitioner's behalf by attorney Robert L. Sirianni, Jr., ("appellate post-conviction counsel"), who later filed the Petitioner's appellate briefs. Mr. Sirianni did not personally appear in the post-conviction court to represent the Petitioner at the hearing. Instead, attorney C. Ann Tipton represented the Petitioner at the post-conviction hearing.

he described as "one of the best" attorneys he knew in the area. He also worked with a private investigator on the case and represented the Petitioner on appeal.

Lead counsel said that he reviewed discovery, researched the law, prepared pretrial motions and that he met with the Petitioner, the private investigator, and the Petitioner's family on multiple occasions. Lead counsel stated he fashioned a theory of self-defense for the case, as well as an alternative theory that the Petitioner's act was not premeditated and, therefore, was not first degree murder. Lead counsel stated he discussed these theories with the Petitioner.

According to lead counsel, he believed the self-defense theory would be raised by the Petitioner's statement, the victim's toxicology report, and Ms. Jordan's testimony regarding the Petitioner's nose injury. Lead counsel indicated that through this evidence, he attempted to establish the Petitioner's state of mind. Lead counsel stated he tried to paint a picture that the Petitioner had been attacked by someone under the influence of drugs and that the shooting was the Petitioner's reaction to the attack. Lead counsel said that he attempted to impeach Mr. Williams on cross-examination after Mr. Williams's testimony at trial differed from his police statement. To further bolster the theory of self-defense, lead counsel attempted to introduce evidence of the victim's prior violent conduct to show that she was the first aggressor, but this evidence was excluded. Lead counsel testified that he attempted to emphasize the perspective of being attacked by someone under the influence of drugs to the jury while diminishing the relative sizes and gender roles of the Petitioner and the victim. Lead counsel also stated that he had discussed these issues with the Petitioner and would have advised him about the pros and cons of testifying.

Additionally, lead counsel said that he requested a jury instruction on self-defense during the trial and "persistently and repeatedly" argued for this instruction throughout the trial. Lead counsel noted that he filed a formal written motion requesting the instruction after "the facts were developing on the record" and after the trial court gave an early indication that it might not give the self-defense instruction. Lead counsel testified that in his experience, trial courts will not typically rule on the issue of a self-defense instruction pretrial before the facts develop.

Testifying at the hearing, the Petitioner agreed that he discussed legal defense theories with trial counsel before trial. However, he stated that they did not go into the details of a self-defense claim. The Petitioner stated that trial counsel never asked about his state of mind when he shot the victim—specifically, whether he was in fear for his safety. The Petitioner also said that trial counsel did not discuss with him his testifying

until they "got ready to go to trial." He testified that lead counsel told him "it might be best" if he did not take the stand because it might harm his defense given his police statement. But, trial counsel told him it was his choice, the Petitioner said.

When the Petitioner was asked at the hearing if he felt fear he would suffer serious bodily injury or death at the time of the incident if he did not act, the Petitioner responded, "Any time you're in an altercation, it's a possibility that you're going to feel fear that you're going to get hurt or something like that." When asked the same question again, the Petitioner said, "yes." The Petitioner stated that if he were to have testified at trial, he would have testified that he was in fear and given the reasons why. The Petitioner also said he received ice for his nose but did not get any other medical treatment.

After the hearing, the post-conviction court denied relief, finding that the Petitioner had failed to establish that his trial counsel were ineffective. Specifically, the Petitioner failed to produce any additional evidence, namely witnesses, that trial counsel could have presented at trial to support a self-defense claim. Further, the Petitioner failed to specify what other defenses trial counsel could have pursued. The post-conviction court noted that lead counsel testified he defended the Petitioner by challenging the credibility of the State's witnesses and their motives for testifying, presented the testimony of Ms. Jordan regarding the Petitioner's nose injury, frequently requested of the trial court a self-defense instruction, and argued to the jury that this killing was justified or a lesser crime than premeditated murder. In addition, the post-conviction court mentioned lead counsel's belief that the Petitioner's statement to police, the victim's toxicology report, and Ms. Jordan's testimony were sufficient to present a self-defense claim.

The post-conviction court further noted that lead counsel argued the "case all the way to the Tennessee Supreme Court," which held, unfavorably to the Petitioner, that self-defense was not fairly raised by the proof. Citing all of trial counsels' efforts in the case, the post-conviction court stated, "There is absolutely nothing else that [trial counsel] could have done on this case." Accordingly, the post-conviction court determined that the Petitioner had failed to show either of the two requirements for ineffective assistance of counsel: deficient performance or prejudice.

Addressing separately the adequacy of trial counsels' pretrial preparation relative to the Petitioner's "specious argument" regarding the failure to develop any viable defense, the post-conviction court stated that the Petitioner had failed to present any proof in support of his allegation. The post-conviction court observed that "the gist" of the Petitioner's argument was that trial counsel "did not mount a defense, interview witnesses, or cross-examine the State's witnesses . . . well." Ultimately, the post-conviction court

determined that the record showed trial counsel zealously represented the Petitioner and that the Petitioner had failed to prove he was prejudiced by the tactical decisions of trial counsel.

In a related issue, the post-conviction court held that lead counsel "made a strategic, trial, tactical decision to challenge credibility of the victim and other witnesses." According to the post-conviction court, the record clearly indicated that "trial counsel vigorously challenged and cross-examined prosecution witnesses." The post-conviction court found that the Petitioner's allegation that trial counsel did not effectively cross-examine the State's witnesses was meritless.

The post-conviction court also addressed as separate issue trial counsels' advice to the Petitioner not to testify at trial. The post-conviction court noted that the trial court had conducted a *Momon*[2] hearing in this case and found the Petitioner's testimony at the post-conviction hearing concerning his election to testify was not credible. The post-conviction court determined that the Petitioner was untruthful at the post-conviction hearing when he insisted trial counsel forced, influenced, or coerced him not to testify at trial. Additionally, the post-conviction court found the Petitioner's testimony at the hearing to be insufficient to fairly raise the issue of self-defense.

The Petitioner timely filed a notice of appeal.

## II.    ANALYSIS

On appeal, the Petitioner argues that the post-conviction court erred by denying his claim that he received ineffective assistance due to trial counsels' failure to meaningfully present the theory of self-defense. The State argues that the post-conviction court did not err by denying the Petitioner's claim of ineffective assistance of counsel because the Petitioner failed to show either deficient performance or prejudice. We agree with the State.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to

---

[2] *See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

be resolved" by the post-conviction court. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Id.* Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," and reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden v. State*, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That is, the petitioner must establish that his

counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

The Petitioner alleges that trial counsel failed to present any defense and specifically failed to meaningfully present a theory of self-defense. The Petitioner states that trial counsel made no effort toward a self-defense claim, save a failed attempt to request a jury instruction on the issue, and that there were multiple methods trial counsel could have employed to present self-defense effectively. The State responds that the Petitioner failed to prove ineffective assistance of counsel.

Nothing in the record preponderates against the post-conviction court's findings, which demonstrate that trial counsel raised the issue of self-defense throughout the trial and raised, in the alternative, that the Petitioner's act was not premeditated. At the post-conviction hearing, lead counsel testified that he attempted to impeach Mr. Williams on cross-examination after Mr. Williams's testimony at trial differed from his police statement. Lead counsel stated that he filed a motion requesting a self-defense jury instruction during trial, and the record reflects that trial counsel also made oral requests for a self-defense instruction. According to lead counsel, he believed that the Petitioner's statement to police and the victim's toxicology report, which indicated the victim had numerous drugs in her system at the time of the incident, and Ms. Jordan's testimony would support the issue of self-defense. Through this evidence, lead counsel intended to establish the Petitioner's state of mind. Further, lead counsel testified that he attempted to emphasize the perspective of being attacked by someone under the influence of drugs to the jury while diminishing the relative sizes and gender roles of the Petitioner and the victim. As an alternative theory to self-defense, lead counsel stated that he argued to the jury that this killing was a lesser crime than first degree murder because there was no premeditation involved.

At the post-conviction hearing, the Petitioner testified that he never discussed his state of mind during the incident with trial counsel. The Petitioner stated, however, that if he were to have testified at trial, he would have stated that he was in fear during the incident. Later in the post-conviction hearing, the Petitioner admitted that his fear was based on the possibility of getting hurt during a fight or argument and not anything the victim was doing directly. The Petitioner claimed that he was advised by trial counsel not to testify, and this influenced him to not take the stand. The post-conviction court accredited the Petitioner's testimony at the *Momon* hearing, in which the Petitioner stated that his election not to testify was a personal decision made knowingly, intelligently, and voluntarily, over his testimony at the post-conviction hearing. Importantly, the

post-conviction court found the Petitioner's testimony at the hearing to be insufficient to fairly raise the issue of self-defense.

During the post-conviction hearing, the Petitioner was asked repeatedly what his trial counsel could have done differently or what more they could have done in his case. The Petitioner gave either no or vague responses to these inquiries. Additionally, as the post-conviction court noted, the Petitioner produced no other witnesses or evidence to establish his claim that his trial counsel were ineffective.

The Petitioner argues that trial counsel could have raised self-defense in a pretrial motion or a motion for directed verdict. During the post-conviction hearing, lead counsel was asked if he had filed any pretrial motions requesting a self-defense jury instruction. Lead counsel stated that a motion was filed mid-trial. While it appears that lead counsel may have also orally requested a self-defense instruction pretrial, *see Benson*, 2018 WL 5810004, at *7, pretrial motions are not required for general defenses such as self-defense. *See State v. Hawkins*, 406 S.W.3d 121, 129 n.9 (Tenn. 2013) (noting that self-defense is a general defense which does not require pretrial notice). Additionally, lead counsel testified in the post-conviction hearing that, in his experience, trial courts will not typically rule on the issue of a self-defense instruction pretrial before the facts develop. "Deference will be given to *sound* trial strategy. . . . if the choices are informed ones based on adequate preparation." *Cooper*, 847 S.W.2d at 528. Nothing in the record suggests that lead counsel's choice was uninformed or based on inadequate preparation. Rather, lead counsel based his decision upon his experience and knowledge regarding requests for self-defense jury instructions, a strategic decision that we will not second-guess on post-conviction review. *See Hellard*, 629 S.W.2d at 9. Relative to a motion for directed verdict, lead counsel was not asked during the post-conviction hearing about raising the self-defense issue in such a motion, and therefore, the Petitioner has failed to prove this allegation of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f); *see Dellinger*, 279 S.W.3d at 293-94. In sum, the post-conviction court correctly ruled that the Petitioner had not established deficient performance of trial counsel.

Additionally, we agree with the post-conviction court that the Petitioner has failed to show his trial counsels' performance prejudiced him. The Petitioner claims that "[t]here is a substantial probability—had Trial Counsel rendered effective performance—that [the Petitioner's] trial would have gone differently." Specifically, the Petitioner repeatedly states that this court on intermediate direct appeal confirmed he had a viable self-defense claim, and therefore, we should now find that the self-defense claim was necessary for the proper presentation of his defense.

Before addressing this argument, we will address an issue with post-conviction appellate counsel's briefs. On seven separate occasions in his principal and reply briefs, post-conviction appellate counsel either cites to or quotes from this court's decision in *Benson*, 2018 WL 5810004. While we generally applaud citation to and reliance on our prior decisions, we do not encourage this practice when the cited decision has been reversed by our state's highest court.[3] This is especially true when the cited case also happens to be the case at bar. Not once in his briefing does appellate counsel cite to our supreme court's decision in *Benson*, nor does he give the slightest indication that the decision from our court—on which he so stridently relies—has been reversed. Based on the record, appellate counsel was aware of the supreme court's decision in *Benson*. In the memorandum of law in support of the petition for post-conviction relief, for instance, appellate counsel acknowledges and references the supreme court's decision. Additionally, appellate counsel attached the supreme court's decision to the memorandum. For reasons unknown, appellate counsel neglected to cite to controlling law before our court or, more importantly, to argue how this controlling law affects the appellate claims that he is advancing.

As evident throughout the record but not acknowledged by the Petitioner in his briefs, his relief before our court on direct appeal was short-lived. The supreme court reinstated the judgment of the trial court in 2020, reversing the decision of this court, and held unequivocally that the Petitioner did not have a viable self-defense claim. *Benson*, 600 S.W.3d at 907-08. Further, the supreme court noted that even if the trial court erred in not instructing the jury on self-defense, "such an error would have been 'harmless beyond a reasonable doubt because no reasonable jury would have accepted the [Petitioner's] self-defense theory[,]'" *id.* (citing *Perrier*, 536 S.W.3d at 404-05), a conclusion that forecloses the Petitioner's claims of *Strickland* prejudice before this court. As the trial court below recognized during the trial proceedings, "There's absolutely nothing . . . that would allow a jury to conclude that this [Petitioner] had . . . reasonable grounds to fear . . . serious bodily injury or death." *Id.* The post-conviction court correctly ruled that the Petitioner had not established prejudice. He is not entitled relief.

---

[3] This is the case unless, of course, counsel acknowledges the reversal and cites to the intermediate opinion for support of a proposition outside the holding of the controlling decision or is making a good faith argument for a modification or reversal of controlling law.

### III. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
KYLE A. HIXSON, JUDGE